**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**

**-vs-**                                                    **Case No. 6:09-cr-210-Orl-19GJK**

**GARY CHARLES NETH**
**NICOLE ANN ALDRIDGE**
**JANINE SCHELLER HASKELL**
**RICHARD BENJAMIN OWEN JR,**
**CLARA ELLEN HANSEN**
_____

**ORDER**

This case comes before the Court on the following:

1.      Motion to Suppress by Gary Charles Neth and Nicole Ann Aldridge (Doc. No. 92, filed Feb.

        16, 2010); and

2.      Response in Opposition to Defendants' Motion to Suppress by the United States of America

        (Doc. No. 110, filed Mar. 12, 2010).

**Introduction**

On October 22, 2009, a federal grand jury returned a two-count indictment against Gary

Charles Neth, Nicole Ann Aldridge, Janine Scheller Haskell, Richard Benjamin Owen, Jr., and Clara

Ellen Hansen (collectively "Original Defendants"). (Doc. No. 1, filed Oct. 22, 2009.) Count I of the

indictment charges the Original Defendants with conspiracy to manufacture and to possess with the

intent to manufacture 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1). *Id.* Count

II charges the Original Defendants with knowingly manufacturing and possessing with the intent to

manufacture 100 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1). *Id.* Ms. Haskell and

Mr. Owen entered separate plea agreements as to Count I. (Doc. No. 47, filed Dec. 24, 2009; Doc. No. 53, filed Jan. 15, 2010.)

On February 24, 2010, Mr. Neth and Ms. Aldridge filed the present Motion to Suppress. (Doc. No. 92.) Ms. Hansen filed a Motion to Adopt Mr. Neth and Ms. Aldridge's Motion to Suppress, which the Court granted on February 25, 2010.[1] (Doc. No. 93, filed Feb. 21, 2010; Doc. No. 97.) The Government filed a Response in Opposition to the Motion to Suppress on March 12, 2010. (Doc. No. 110, filed Mar. 12, 2010.) On March 24, 2010, the Court held an evidentiary hearing on the Motion to Suppress (Doc. No. 110) which was attended by Ms. Aldridge, Mr. Neth, Ms. Haskell and their respective counsel as well as counsel for the Government.

**Findings of Fact**

The Court makes the following findings of fact after considering the evidence and observing the witnesses as they testified.

In August of 2009, the Brevard County Sheriff's Office ("BCSO") received an anonymous Crime Line tip alleging that the residence located at 3380 Parkland Street, Titusville, Florida, (the "Parkland Residence") was being used for cultivating cannabis. The tip also alleged that Gary Neth, Janine Haskell, George Haskell, Reggie Biegler, and Michelle Biegler were involved in the cultivation and trafficking of cannabis. In response to the Crime Line Tip, visual and camera surveillance was established at the Parkland Residence. Agents from the Special Investigations Unit of the BCSO went to the Parkland Residence on August 18, 2009 where Agent Chris Williams observed two large window air conditioning units on the residence as well as an exterior cooling unit attached to the

---

[1] The Court will refer to Hansen, Neth, and Aldridge collectively as "Defendants."

residence. The two large window air conditioning units ran continuously the entire time the agents were at the residence. On August 19, 2009, Agent Jason Hart, the case agent in charge of the investigation, observed Mr. Neth traveling from the Parkland residence to a residence located at 5020 Banana Avenue, Cocoa, Florida (the "Banana Residence"). Mr. Neth is the registered owner of the Banana Residence. That same day, Agent Hart observed Mr. Owen leaving the Parkland Residence.[2]

On August 24, 2009, Agent Ziccardi, Agent Williams and Agent Steuerwald went to the Banana Residence at approximately 8:30 p.m. Agent Hart testified that this was not an unusual time to approach the house because the officers had been working on the case all day. Agent Hart testified that the purpose of the visit was to do a "knock and talk" to see if they could talk to the residents and obtain permission for a consensual search. He testified that at the time the agents did not know if the Banana Residence was part of an indoor marijuana grow operation.[3]

The three agents walked up the driveway towards the front door of the Banana Residence. Before reaching the front door and while still on the driveway to the house, they detected the strong odor of fresh cannabis.[4] They then decided to retreat from the property and contact Agent Hart. Agent Hart called off the "knock and talk" but directed the three agents to maintain surveillance of

[2]Although not inquired into in the evidence, Agent Hart's search warrant affidavit provided that Trooper James Barley conducted a traffic stop on Mr. Owen's vehicle and detected the odor of fresh cannabis from within the vehicle and observed cannabis on Mr. Owen's shirt.

[3] The Banana Residence search warrant affidavit states that Mr. Neth was observed traveling from the Parkland Residence to the Banana Residence on August 19, 20, and 24, 2009. The affidavit also states that Ms. Aldridge was observed traveling from the Parkland Residence to the Banana Residence on August 19, 2009.

[4] At the evidentiary hearing, Agent Ziccardi related his training in detecting the smell of fresh marijuana.

the premises. Agent Hart stated that because it could be a large grow operation, he did not want three agents going alone and knocking on the door, so he decided to regroup. Later that evening, while conducting surveillance of the Banana Residence from a neighbor's property, Agent Ziccardi observed an extremely bright light coming from within the north side of the Banana Residence when someone opened a door. Agent Ziccardi testified that it was a high intensity light of the kind used in marijuana grow operations.[5]

On August 25, 2009, Agent Hupfer observed Ms. Haskell exiting a vehicle at the Banana Residence with several stakes in her hand. Agent Hupfer saw Ms. Haskell enter the Banana Residence with the stakes in her possession. Agent Hupfer recognized the stakes as the type often used to grow cannabis. Later that evening, electronic surveillance recorded Ms. Hansen, Ms. Haskell, and Ms. Aldridge open the back doors of a vehicle parked at the Parkland Residence, unload several bags and carry them into the residence. The bags were green and white in color and appeared to be bags for fertilizer or potting soil.

On September 2, 2009, Agent Hart presented Judge John Griesbaum of the Eighteenth Judicial District, in and for Brevard County, with two applications for a search warrant, one for the Parkland Residence and one for the Banana Residence. Agent Hart has been a member of the BCSO since July 2003. He has been assigned to the Uniform Patrol Division, the Field Training Officer Program, the General Crimes Unit, and the Special Investigations Unit. Agent Hart is currently assigned to the Special Investigations Unit as a narcotics/vice Agent and has taken several training courses on narcotics and narcotics investigations. Hart was the affiant in both affidavits for search warrants

---

[5] The Agents conducted surveillance of the Banana Residence that evening until 23:55 hours.

which Judge Griesbaum signed on September 2, 2009, and Hart testified that the facts contained in the affidavits were true.

## I. Execution of the Banana Residence Search Warrant

After the BCSO obtained the Banana Residence search warrant, members of the BCSO Special Investigations Unit, including Agent Brian Stoll, arrived at the residence along with a BCSO SWAT team unit. Lieutenant Bruce Barnett was the SWAT team leader at the Banana Residence.[6] The Banana Residence SWAT team consisted of eight officers. Two officers were instructed to secure a separate structure located behind the Banana Residence. The six remaining officers, including Lieutenant Barnett, approached the front door of the residence. At the direction of Lieutenant Barnett, one of the Banana SWAT team members knocked on the front door of the residence and announced "Brevard County Sheriff's Office! Search Warrant!" The officer repeated this sequence two to three times. While standing outside the front door, Lieutenant Barnett heard what sounded like a male voice coming from inside the residence. Lieutenant Barnett could not determine what the voice was saying. The SWAT team members were not able to see inside the residence from their position at the front door because the window next to the door was covered by mini-blinds and a large blue cloth. The oval window in the front door had also been covered. However, Lieutenant Barnett did see a blind in the window move and discerned a small camera at the base of the window by the mini-blinds. There was undisputed testimony that dogs were barking inside the residence.

After announcing their presence and the front door remaining closed, the SWAT team attempted to enter the residence with the use of a battering ram. Initially, they were only able to open

---

[6] Lieutenant Barnett has been a member of the BCSO for more than twenty years, executing over 100 search warrants in his ten years with the SWAT team operation.

the front door a few inches because the entrance was blocked by a sofa and one or more steel tanks. Eventually, the SWAT team was able to open the front door far enough to gain access to the residence. Mr. Neth, who was inside the house, argued with the SWAT team about securing the four dogs that had been loose inside the residence. At this point, a SWAT team member tackled Mr. Neth, secured him on the ground with a flex tie, then placed him on the couch in the front room. It is undisputed that Mr. Neth did not initially comply with SWAT team orders but instead sought to secure one or more of the dogs which had been loose in the house. After being secured, Mr. Neth testified that he repeatedly asked to see the search warrant. Agent Stoll, who was in possession of the search warrant at the time it was executed, testified that he briefly showed Mr. Neth a copy of the warrant.[7]

Ms. Aldridge was also at the Banana Residence when the SWAT team arrived. Before the SWAT team members were able to enter the house but after she knew that they were outside the front door, Aldridge opened a hall door about ten feet from the front door and shouted to Mr. Owen and Ms. Haskell, who were in the rear of the house, to get out of the area.[8] Like Mr. Neth, Ms. Aldridge also attempted to secure the dogs when the SWAT team entered the residence. Ms. Aldridge was eventually allowed to put one or more dogs in the back sunroom. She too was secured on the ground with a flex tie and placed on the couch. Both Mr. Neth and Ms. Aldridge requested permission to use the bathroom facilities during the search and were permitted to do so.

Approximately two hours into the execution of the warrant, Agent Stoll became ill and had to leave the premises. At that time, Agent Stoll gave the search warrant to Agent Craig Hufner. Mr.

---

[7] Mr. Neth testified that he never asked that the search warrant be read to him.

[8] The SWAT team apprehended a person who ran out of the back door of the house.

Neth and Ms. Aldridge were removed from the premises approximately three hours after the SWAT team had gained admission and before the conclusion of the inventory of the search warrant execution. By the conclusion of the search warrant execution, the front door frame had been damaged by the battering ram, blue gloves and trash bags had been left on the premises, numerous items had been removed from the cabinets, trash cans were turned over in the yard, and the interior of the residence was in a general state of disarray. The BCSO discovered over 200 mature cannabis plants inside the Banana Residence. Agent Ziccardi left a copy of the search warrant and inventory in the kitchen/dining room area of the residence on a table or counter.

## II. Execution of the Parkland Residence Search Warrant

After the BCSO obtained the Parkland Residence search warrant, members of the BCSO Special Investigations Unit, including Agent Hart, arrived at the residence along with a BCSO SWAT team unit. The SWAT team unit announced its presence before entering. Except for two dogs, the residence was unoccupied when the search warrant was executed. Accordingly, at the conclusion of the search Agent Hart placed a copy of the search warrant and the inventory on the kitchen table in the residence.

## Analysis

## I. Alleged Fourth Amendment Violations

The Fourth Amendment serves as a general proscription against warrantless searches and requires that search warrants be based on probable cause. U.S. Const. amend. IV. The Supreme Court has referred to probable cause as "a fluid concept-turning on the assessment of probabilities in particular factual contexts - not readily, or even usefully reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). What is required in assessing probable cause is "a

practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 238; *see also United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002). Therefore, in assessing whether probable cause to search exists, a court must view the "totality of circumstances" set forth in the search warrant affidavit. *Gates*, 462 U.S. at 213.

The Fourth Amendment requirement of probable cause for a search warrant protects the interests of individuals in their homes, properties, and possessions against unjustified police intrusion. *Steagald v. United States*, 451 U.S. 204, 213 (1981). Items seized in violation of the Fourth Amendment may be excluded from evidence in a criminal proceedings against a person with standing to object to the search. *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963). Notwithstanding this general principle, the Supreme Court has established a "good faith exception" to the exclusionary rule. *United States v. Leon*, 468 U.S. 897, 922 (1984). This "good faith exception" provides that courts generally should not render inadmissible evidence obtained by police officers acting in reasonable reliance on a search warrant issued by a neutral and detached magistrate that is ultimately found to be unsupported by probable cause. *Id*. The "good faith exception" does not apply in four limited situations: (1) where the magistrate or judge in issuing a warrant was misled by information that the affiant knew was false or would have known was false except for his reckless disregard of the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit supporting the warrant is so lacking in indica of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient that the executing officers cannot reasonably presume that it is valid. *Martin*, 297 F.3d at 1313 (citing *Leon*, 468 U.S. at 923). In addition, where evidence is seized pursuant to a search warrant

issued in reliance on information obtained during a prior illegal warrantless search, the good faith

exception does not apply. *United States v. McGough*, 412 F.3d 1232, 1236-40 (11th Cir. 2005).

None of these exceptions applies here, nor has any Defendant argued that they apply.

### A. Trespass

In the present case, the Defendants argue that a warrantless entry onto the curtilage of the

Banana Residence was made by Agents Ziccardi, Williams and Steuerwald ("Agents") on August 24,

2009, in violation of the Defendants' Fourth Amendment rights. (Doc. No. 92 at 11.) In response,

the Government maintains that the entry onto the Banana property did not violate the Fourth

Amendment because the approach to the front door from the driveway did not constitute a trespass

cognizable under the Fourth Amendment. (Doc. No. 110 at 10.)

The private property immediately adjacent to the home, much like the home itself, is entitled

to protection against unreasonable search and seizure. *United States v. Taylor*, 458 F.3d 1201, 1206

(11th Cir. 2006). This area, known as the curtilage, "is the area that harbors 'the intimate activity

associated with the sanctity of a man's home and privacy of life.'" *Oliver v. United States*, 466 U.S.

170, 180 (1984) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). The extent of the

curtilage "is determined by factors that bear upon whether an individual reasonably may expect that

the area in question should be treated as the home itself." *United States v. Dunn*, 480 US. 294, 300

(1987). A court must examine four factors in determining the boundaries of the curtilage: (1) the

proximity of the areas claimed to be the curtilage to the home; (2) whether the area is included within

an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the

steps taken by the resident to protect the area from observation by people passing by. *Id*. at 301. The

Defendants bear the initial burden of showing that the Agents violated their legitimate expectation

of privacy in the curtilage searched. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008). If the Defendants meet this burden, the Government must show that an exception to the warrant requirement applies. *Id.*

In the present case, the Agents walked up the driveway toward the front door of the Banana Residence. While still on the driveway, but before they arrived at the front door, the Agents detected the odor of fresh cannabis and retreated from the property. Although the Agents were in close proximity to the residence when they detected the cannabis, the driveway where they detected the cannabis was not included within an enclosure surrounding the residence but instead provided clear and unimpeded access to the front door. There is no evidence before the Court to suggest that the area in question was obstructed in any way from the public's observation. Therefore, the residents did not have a reasonable expectation of privacy in the area of the driveway where the Agents detected the odor of fresh cannabis. Accordingly, the area in question was not within the curtilage of the Banana Residence. *See United States v. Rodgers*, 924 F.2d 219, 221 (11th Cir. 1991) (finding that the pathway that led from the driveway to the front door was not within the curtilage); *United States v. Alvin*, No. CR208-25, 2009 WL 722267, at *3 (S.D. Ga. Mar. 18, 2009) (finding that a driveway was not located within the curtilage of the residence where it was used for ingress to and egress from the residence, was not within an enclosure of any kind, and was not obstructed in any way from the public's observation). Thus, the Agents' observations from the location of the Banan Residence driveway did not violate the Defendants' Fourth Amendment rights.[9]

_____

[9] In the Motion to Suppress, the Defendants allege that subsequent to their smelling cannabis from the driveway, the Agents conducted their surveillance on August 24, 2009, from the shrubbery and trees on the west side of the Banana Residence property. (Doc. No. 92 at 11, 13, 15-16). However, there is no evidence to support a finding that the Agents entered the Banana Residence

Even assuming the area of the driveway where the Agents detected the smell of cannabis was within the curtilage of the Banana Residence, the Agents still did not violate the Defendants' Fourth Amendment rights. It is well established that "the Fourth Amendment is not 'implicated by entry upon private land to knock on a citizen's door for legitimate police purposes unconnected with the search of the premises.'" *United States v. Taylor*, 458 F.3d 1201, 1204 (11th Cir. 2006) (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 466 (1971)); *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 1991) (no warrant necessary for officers to approach house to question the occupants). "'Absent express orders from the person in possession' an officer may 'walk up the steps and knock on the front door of any man's castle, with the honest intent of asking questions of the occupant thereof.'" *Taylor*, 458 F.3d at 1204. (quoting *Davis v. United States*, 327 F.2d 301, 303 (9th Cir. 1964)). Thus, law enforcement officers may "knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just [as] any private citizen may." *Id.* (citing *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir. 2003)).

Here, the Agents approached the Banana residence by walking up an unenclosed driveway with the intent to knock on the door and speak with the residents.[10] The Agents therefore approached

---

property to conduct this surveillance. Instead, the testimony is unrefuted that the Agents were located on the neighbor's property at all times, not on the Banana Residence property. Thus, the Agents did not enter the curtilage of the Banana Residence, and their surveillance of the property from the neighbor's yard did not violate the Defendants' Fourth Amendment rights.

[10] While the Defendants allege that the Agents approached the Banana residence with the intent to search the premises, this allegation is not supported by the evidence. Three agents walked directly up an unenclosed driveway toward the front door of the residence. There is no evidence that they attempted to conceal their presence during their approach, nor did they enter an area of the property that was not otherwise visible from the street and the residence. Furthermore, as soon as they detected the odor of cannabis, they immediately retreated from the property. Thus, it cannot be said that the Agents approached the Banana residence with the intent to search the premises.

the house "just [as] any private citizen may." *Id.* Furthermore, the Defendants do not allege, and the record does not reflect, that the residence was unoccupied at the time the Agents approached or that the Agents breached an enclosed or secured area, distinguishing this case from the facts in *United States v. Quintana*, 594 F. Supp. 2d 1291 (M.D. Fla. 2009).[11] Armed with a suspicion that a cannabis grow operation was underway at the Parkland Residence, and unsure what the relationship of the Banana Residence was to the investigation, if any, the Agents were permitted to approach the residence and attempt to verify or dispel their suspicions of criminal activity.[12] *See United States v. Correa*, 347 F. App'x 541, 545 (11th Cir. 2009) (citing *United States v. Tobin*, 923 F.2d 1506, 1511 (11th Cir. 2009) (finding that the agents were permitted to approach a residence to verify or dispel their suspicions of criminal activity)). Accordingly, the Court finds that the Agents lawfully walked up the driveway to the Banana Residence on August 24, 2009.

### B. Lack of Probable Cause

It is the obligation of this Court to review the searches and seizures authorized by warrants. *Elkins v. United States*, 364 U.S. 206, 223-24 (1960). This review must be independent and is controlled by federal law. *Id.* In considering a motion to suppress evidence seized pursuant to a

---

[11] The Defendants maintain that *United States v. Quintana*, 594 F. Supp. 2d 1291 (M.D. Fla. 2009), supports their contention that the Agents' approach to the Banana residence violated the Fourth Amendment. However, in *Quintana* the defendant was in custody at the time the officers entered the property, foreclosing any reasonable argument that the officers were seeking to speak to the defendant. Furthermore, in order to gain access to the area in question, the officers in *Quintana* jumped over a fence and unlocked an electronic driveway gate, foreclosing any reasonable argument that they approached the residence as a private citizen could.

[12] The BCSO received a tip that the Parkland Residence was being used for cultivating cannabis and that the owner of the Banana Residence, Mr. Neth, was engaged in the cultivating and trafficking of cannabis. After surveilling the Parkland Residence, the BCSO observed Mr. Neth travel between the Parkland Residence and the Banana Residence on three separate occasions.

warrant on grounds that probable cause did not exist, the judge considering the motion must give great deference to the issuing magistrate's decision. *United States v. Ventresca*, 380 U.S. 102, 108-09 (1965).

### 1. Banana Residence

In the Motion to Suppress, the Defendants challenge Judge Griesbaum's finding of probable cause to search the Banana Residence. (Doc. No. 92 at 6.) In particular, the Defendants allege that the search warrant affidavit for the Banana Residence failed to sufficiently describe the basis of the agents' knowledge and ability to distinguish the odor of fresh cannabis. (*Id*. at 7-10.) Defendants maintain that a police officer of ordinary training and experience would not recognize the odor of fresh cannabis, and therefore the affidavit must provide references to the specific training and experience of the agents allegedly detecting the odor. *Id*. at 8.

The search warrant affidavit for the Banana Residence states that Agents Ziccardi, Williams, and Steuerwald "detected the strong, distinct odor of fresh cannabis" as they walked up the driveway toward the front door of the Banana Residence. (Doc. No. 110-1 at 5.) The affidavit further states that Agent Ziccardi has training and experience investigating numerous indoor grow operations. *Id*.

The essential test for determining whether the detection of an odor establishes sufficient probable cause for a search warrant was set forth by the Supreme Court in *Johnson v. United States*, 333 U.S. 10 (1948). In *Johnson*, the Supreme Court found that a magistrate may rely on the detection of an odor to establish probable cause for a search "[if] the presence of the odor is testified to before [the] magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinct to identify a forbidden substance." *Id*. at 14; *see also United States v. Pond*, 523 F.2d 210, 212 (2d

Cir. 1975) (holding that "smell alone may justify issuance of a warrant if the affiant is qualified to know the odor and the odor is distinctive.").

Where odors are not commonly recognizable to an average police officer, a magistrate will not be permitted to credit statements that an officer recognized the odor without being specifically informed as to how the officer is qualified to know the odor in question. *See, e.g.*, *Hervey v. Estes*, 65 F.3d 783, 789 (9th Cir. 1995) (finding that a neutral magistrate could not possibly credit the deputy's broad statement that he smelled the odor of a methamphetamine lab, mainly acetone and P2P, without knowing how the deputy was trained to recognize the odor); *United States v. Sweeney*, 688 F.2d 1131, 1137-38 (7th Cir. 1982) (finding that where an affidavit stated that the affiant had been in charge of a clandestine laboratory investigation and was intimately familiar with the odor of chemicals used in manufacturing methamphetamine, the affidavit was sufficient to support the magistrate's finding that the agent had recognized the odor of the manufacture of methamphetamine). On the other hand, where an odor is more easily recognizable to an officer, such as the odor of fresh cannabis, a magistrate is permitted to rely on an affidavit providing less detailed information regarding how the officer is qualified to recognize the odor.[13] *See, e.g.*, *United States v. Morin*, 949 F.2d 297, 300 (10th

---

[13] Defendants cite *United States v. DeLeon*, 979 F.2d 761 (9th Cir. 1992), for the proposition that the issuing judge could not have relied on the Agents' statements regarding the odor of fresh cannabis because the affidavit did not sufficiently recite their qualifications to detect the odor. (Doc. No. 92 at 8-9.) However, *DeLeon* does not require a finding that the instant affidavit was insufficient. *DeLeon* concerned an individual who was not a law enforcement officer but instead was someone on the property in question in order to discuss the sale of farm equipment. *Id*. at 764. Nothing in the record suggested that he was qualified to detect the odor of growing marijuana plants. *Id*. at 764-65. In the present case, Agent Ziccardi has been a member of the BCSO for nineteen years, spending over four years in the Special Investigation Unit where has investigated drug related offenses. Moreover, the affidavit specifically states that Agent Ziccardi has training and experience investigating numerous indoor cannabis grow operations.

Cir. 1991) (finding probable cause for a search of a passenger's luggage on a train where a narcotics detective smelled marijuana in a bag); *United States v. Arrasmith*, 557 F.2d 1093, 1095 (5th Cir. 1977) (finding that the district court properly relied upon the testimony of an experienced border patrol agent in finding that marijuana has a distinctive smell); *United States v. Correa*, No. 1:07-cr-00011-MP-AK, 2008 WL 1804309, at *9 (N.D. Fla. Apr. 18, 2008) (upholding a magistrate's probable cause finding where a DEA agent and a narcotics investigator reported smelling the odor of cannabis emanating from a grow house despite the sophisticated ventilation and filtration systems designed to prevent the odor from emanating from the house). Here, the affidavit clearly states that Agent Ziccardi has training and experience investigating numerous indoor cannabis grow operations. Such a recitation is sufficient to permit an issuing judge, in making a probable cause determination, to credit the statement that Agent Ziccardi recognized the odor of fresh cannabis outside the Banana Residence.[14]

In addition to the odor of fresh cannabis, the finding of probable cause to search the Banana Residence is supported by other facts provided in the affidavit. First, the affidavit discusses the anonymous tip received by the BCSO indicating that Gary Neth was involved in the cultivation and trafficking of cannabis. *See Leon*, 462 U.S. at 246 (finding that an anonymous tip, coupled with independent corroboration, may be used to support a magistrate's finding of probable cause). The affidavit states that Mr. Neth resided at the Banana Residence. The affidavit discusses Agent Ziccardi's observation of an extremely bright light escaping from within the Banana Residence when a door was opened and describes how, based on his training and experience investigating numerous indoor grow operations, Agent Ziccardi knew that the light he observed was consistent with that

---

[14] Defendants do not contend that the affidavit was false or misleading as to Agent Ziccardi's ability to detect the smell of marijuana.

produced by high intensity light bulbs used for indoor cultivation of cannabis. Finally, the affidavit provides that Agent Hupfer observed Ms. Haskell pull into the driveway of the Banana Residence, exit the vehicle, and enter the Banana Residence with several stakes in her hands that Agent Hupfer knew, from his training and experience investigating cannabis grow operations, were the type used to cultivate cannabis. Thus, the finding of probable cause is supported by the agents' detection of the odor of fresh cannabis, the anonymous tip implicating Mr. Neth, the fact that Mr. Neth lived at the Banana Residence, the bright light observed escaping from the residence, and the observation of Ms. Haskell carrying stakes into the residence. In light of these facts, and under the flexible, totality of the circumstances approach established in *Gates*, the Court finds that the Banana search warrant provided a substantial basis for concluding that probable cause existed to search the residence and is therefore legally sufficient on its face.

Even assuming that the Banana search warrant lacked probable cause, the good faith exception to the exclusionary rule established in *Leon* would still apply, thereby prohibiting suppression. Agents Stoll and Ziccardi, who executed the search warrant at the Banana Residence, testified that they each had a good faith belief that the warrant was supported by probable cause. The Court finds this testimony to be credible. Furthermore, the Defendants do not argue that any of the limitations to the good faith exception are applicable here. Accordingly, even if the Court were to find that the Banana search warrant lacked probable cause, suppression would not an appropriate remedy.

### 2. Parkland Residence

The Defendants additionally attack the finding of probable cause to search the Parkland Residence. The Parkland search warrant affidavit discusses an anonymous tip received by the BCSO alleging that the Parkland Residence was being used for indoor cultivation of cannabis and that Reggie

Biegler, the owner of the residence, was involved in the cultivation and trafficking of cannabis. The affidavit describes that Agent Williams saw two large air conditioning units at the residence running continuously the entire time the agents were at the residence as well as an exterior cooling unit attached to the residence. The affidavit states that Agent Williams knew from his training and experience that those who cultivate cannabis indoors often run multiple air conditioning units to account for the heat generated by the high intensity light bulbs used to simulate a natural growth environment. The affidavit recites that after leaving the Parkland Residence, Mr. Owen was stopped by Trooper Barley, who detected the strong, distinct odor of fresh cannabis from within the vehicle and observed a green substance on Mr. Owen's shirt. The affidavit then specifically states that based on his multiple years of narcotics training and diversion, Trooper Barley was able to identify the substance he saw on Mr. Owens' shirt as cannabis. Finally, the affidavit provides that electronic surveillance recorded Ms. Hansen, Ms. Haskell, and Ms. Aldridge carrying several green and white bags that appeared to be containers for fertilizer or potting soil into the Parkland residence.[15] Thus, the finding of probable cause is supported by the anonymous tip, the Agent's observation of the two continuously running air conditioning units and the exterior cooling unit, the traffic stop of Mr. Owen,

---

[15] The affidavit also alleges that "Agent Williams detected the strong, distinct, pungent odor of fresh cannabis" from the roadway near the Parkland residence. (Doc. No. 110-2 at 2.) The affidavit states that Williams knew from training and experience that multiple air conditioning units were often required to cultivate cannabis indoors. However, the affidavit does not establish that Williams was otherwise familiar with the smell of fresh cannabis. While Agent Hart testified that he had worked beside Agent Williams on previous cases, knew his work experience in detecting fresh marijuana, and that Williams was in the BCSO narcotics unit before Hart joined it, Hart did not know Williams' training to identify fresh cannabis by smell and omitted it from the search affidavit. Nonetheless, because the other information provided in the affidavit is sufficient to establish probable cause, the Court need not determine if Judge Griesbaum could have reasonably relied on Williams' ability to detect the odor of fresh cannabis in making a finding of probable cause.

and the observation of Ms. Hansen, Ms. Haskell, and Ms. Aldridge carrying fertilizer or potting soil into the residence. In light of these facts, and under the flexible totality of the circumstances approach set forth in *Gates*, the Court finds that the Parkland search warrant affidavit provided a substantial basis for concluding that probable cause existed to search the residence and therefore is legally sufficient on its face.

Nonetheless, as with Banana search warrant, even assuming that the Parkland search warrant lacked probable cause and therefore violated the Defendants' Fourth Amendment rights, the good faith exception to the exclusionary rule established in *Leon* would apply and prevent suppression of the evidence. Agent Hart, who directed the execution of the search warrant, testified that he had a good faith belief that the warrant for the Parkland Residence was supported by probable cause, and the Court finds his testimony to be credible. Furthermore, the Defendants do not allege that any of the limitations to the good faith exception are applicable in this case. Accordingly, even if the Court were to find that the Parkland search warrant lacked probable cause, under the good faith exception, suppression would not an appropriate remedy.

## II. Execution of the Banana Search Warrant

In the Motion to Suppress, the Defendants assert that any evidence obtained in the search of the Banana Residence must be suppressed because the evidence was obtained as a result of an unconstitutional search and seizure. (Doc. No. 92 at 19.) Defendants allege that the search and seizure was unconstitutional because: (1) the executing SWAT team members violated the "knock and announce" requirement; (2) the executing SWAT team members failed to present Mr. Neth with a copy of the search warrant during the search; (3) the executing SWAT team members used excessive

force and intimidating tactics that were unnecessary under the circumstances; and (4) the search left the Banana Residence in complete disarray. (*Id*. at 19-25.)

## A. Knock and Announce Requirement

In *Wilson v. Arkansas*, 514 U.S. 927 (1995), the Supreme Court held that the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock and announce their identity and purpose before attempting forcible entry. This "knock and announce" requirement serves to protect homeowners from damaged doors, to protect occupants from surprise, and to protect the "occupant's privacy by assuring them that government agents will not enter their home without complying with those requirements (among others) that diminish the offensive nature of any such intrusion." *Hudson v. Michigan*, 547 U.S. 586, 620 (2006).

Defendants contend that the BCSO violated the "knock and announce" requirement in the execution of the Banana Residence search warrant. (Doc. No. 92 at 19.) Lieutenant Barnett, the second person in the SWAT team entry line, testified that the he instructed a SWAT team member to "knock and announce" and that the team member complied with his instruction. Barnett discussed the SWAT team procedure of knocking on the door three or more times and announcing "Brevard County Sheriff's Office! Search Warrant!" before making a forcible entry. Finally, Barnett testified that after knocking and announcing in this manner, he could hear what sounded like a muffled male voice inside the residence and saw the front window mini-blinds move, suggesting that someone inside the residence had heard the SWAT team knock and announce its presence. The Court finds Barnett's testimony to be credible.[16] Accordingly, the Court finds that the BCSO SWAT team complied with

---

[16] Barnett's testimony shows that he knew a person was inside the house who was not opening the door even though the police officers had announced their presence. This testimony is buttressed

the "knock and announce" requirement in the execution of the Banana Residence search warrant. Moreover, even if the Court found that the SWAT team failed to knock-and-announce its presence before executing the warrant, the Defendants would not be entitled to suppression because "[s]uppression is not a remedy for a violation of the knock-and-announce rule." *Hudson*, 547 U.S. at 594.

### B. Failure to Present a Copy of the Search Warrant

In order to satisfy the reasonableness requirement of the Fourth Amendment, officers must not only obtain a valid warrant, but they must conduct themselves in a reasonable manner. *Baranski v. Fifteen Unknown Agents of the Bureau of Alcohol, Tobacco and Firearms*, 452 F.3d 433, 455 (6th Cir. 2006). However, the Fourth Amendment does not require an executing officer to present a property owner with a copy of the warrant before conducting or during his search of the premises. *United States v. Grubbs*, 547 U.S. 90, 98-99 (2006) (citing *Groh v. Ramirez*, 540 U.S. 551, 562 n.5 (2004)). "The Constitution protects property owners not by giving them license to engage the police in a debate over the basis for the warrant, but by interposing, *ex ante*, the 'deliberate, impartial judgment of a judicial officer' . . . between the citizen and the police, and by providing, *ex post*, a right to suppress

---

by the testimony of Ms. Aldridge who stated that Mr. Neth was able to put the older one of the four loose dogs away and was in the process of securing a second, brown dog when the SWAT team members entered the house. Ms. Aldridge also testified that she was able to get up from the couch where she was studying, open the hallway door, and tell Ms. Hansen and Mr. Owen to get out of the area before the SWAT team entered. This testimony suggests that both Mr. Neth and Ms. Aldridge were aware that the SWAT team was at their door well before it actually succeeded in opening the door with the battering ram, further supporting a finding that the SWAT team members complied with the knock and announce requirement.

evidence improperly obtained and a cause of action for damages." *Id.* (emphasis in original) (citing *Wong Sun v. United States*, 371 U.S. 471, 481-82 (1963)).[17]

In the present case, the Defendants allege that the search and seizure of the Banana Residence was unreasonable under the Fourth Amendment because the BCSO failed to show Mr. Neth a copy of the search warrant. (Doc. No. 92 at 23.) Both Mr. Neth and Ms. Aldridge testified that the BCSO refused to show Mr. Neth the Banana Residence search warrant or a copy of it despite Mr. Neth's repeated requests to view the document.[18] However, Agent Stoll, who was in possession of the Banana Residence search warrant when it was executed, testified that he briefly showed the search warrant to Mr. Neth. Agent Stoll also testified that he informed Mr. Neth that he was going to leave

---

[17] In the Motion to Suppress, Defendants argue that *United States v. Thompson*, 667 F. Supp. 2d 758 (S. D. Ohio 2009), supports the proposition that failure to present a copy of the search warrant upon request constitutes an unreasonable execution under the Fourth Amendment. (Doc. No. 92 at 23-24.) In *Thompson*, the occupant repeatedly asked to see the search warrant during the search because she feared that the executing agents were not actually law enforcement agents, as they also refused to provide any form of identification. *Id.* at 765-66. She was also subjected to the additional indignity of being naked when the executing agents entered her house, dressing in front of fourteen officers with guns drawn, and then remaining naked from the waist down during the entirety of the search. *Id.* The *Thompson* court ultimately found that the refusal to present the search warrant to the occupant contributed to the unreasonableness of the search, particularly where the occupant was cooperative and had not jeopardized the search. *Id.* Here, Mr. Neth was briefly shown a copy of the search warrant. Mr. Neth does not allege that he was concerned with the identity of the officers, and Lieutenant Barnett testified that the SWAT team uniforms displayed the "Sheriff's Office" logo in yellow on the front, back, and sleeves of their uniforms and protective gear. Mr. Neth was fully clothed and sitting on the couch during the execution of the warrant. Further, Mr. Neth testified that two patrol officers watched over Defendants while the rest of the officers conducting the search were in plain clothes.

[18] In the Motion to Suppress, Defendants maintain that both Mr. Neth and Ms. Aldridge repeatedly asked for a copy of the search warrant. (Doc. No. 92 at 6.) However, there is no evidence that either Mr. Neth or Ms. Aldridge asked to be given a copy of the search warrant, nor is there evidence that Ms. Aldridge asked to see the search warrant at any point during its execution. Mr. Neth testified that he repeatedly asked to see the search warrant.

a copy of the search warrant at the house.   The Court credits Agent Stoll's testimony, finding that Agent Stoll did in fact, at least briefly, show Mr. Neth a copy of the search warrant.

In *Groh*, the Supreme Court left open the question of whether it would be unreasonable to refuse a request to furnish the warrant at the outset of a search when an occupant of the premises is present and poses no threat to the officers' safe and effective performance of their mission.  *Groh v. Ramirez*, 540 U.S. 555, 556 n.5 (2004).  While Agent Stoll demonstrated how he briefly showed the search warrant to Mr. Neth, the presentation of this document was in the nature of a "flash" which did not enable Mr. Neth to read or peruse it.  In view of the totality of the circumstances of the search of the Banana Residence, this action does not render the search unconstitutional.  While it would have been a better practice for a member of the BCSO to present the search warrant to Mr. Neth for his review on his request during the search of the residence, the Fourth Amendment does not require an executing officer to provide an occupant with a copy of the search warrant before or during its execution.[19]

### C.  Excessive Force and Intimidating Tactics

The Defendants next allege in the Motion to Suppress, that the execution of the warrant at the Banana Residence was unreasonable because the SWAT team members used excessive force and intimidating tactics that were unnecessary under the circumstances.  (Doc. No. 92 at 5-6, 19, 22.)  As discussed previously, the SWAT team initially complied with the knock and announce requirement. After announcing their presence, Lieutenant Barnett testified that he could hear what sounded like a

---

[19] As noted above, Agent Ziccardi testified that after the Defendants had been removed from the residence and the search had been completed, he left a copy of the search warrant and inventory on the table or counter in a little workspace in the living room-kitchen area of the Banana Residence.

male voice coming from inside the Banana Residence; however Barnett could not discern what was

being said.[20]  Barnett further testified that he was unable to see inside the residence when he was

standing at the front door because the window next to the door was covered with mini-blinds and a

blue covering.[21]  Barnett had seen the mini-blinds move at the front window and heard a male voice

coming from within the residence.  At this point Barnett testified that he made the decision to instruct

the SWAT team to breach the door with the battering ram.[22]  Such a decision is certainly reasonable

in light of the occupants' failure to appropriately respond to the knock and announce, the inability of

the SWAT team members to see inside the house, the SWAT team members' knowledge that someone

was inside the house, and the fact that the SWAT team was executing a warrant alleging that the

residence was a cannabis grow house.  *See Storck v. City of Coral Springs*, 354 F.3d 1307, 1318-19

(11th. Cir. 2003) (finding that, in accordance with the Fourth Amendment, officers may forcibly enter

---

[20] At the time the SWAT team was attempting its entry into the Banana Residence, dogs inside the house were loose and barking and the indoor cannabis grow operation with its attendant lights and equipment, was up and running as can be seen in the photographs admitted into evidence.

[21] Mr. Neth testified that the SWAT team would not have been able to see inside the residence due to the blinds and the blue covering over the window.  The blue covering can be seen in Government's Exhibit 11.  Mr. Neth further testified that there was a covering behind the glass oval window that was part of the front door itself, further obscuring the SWAT team's view into the house.

[22] In the Motion to Suppress, the Defendants maintain that "[a] team of fifteen to twenty officers screaming threats and obscenities assaulted the residence without warning . . . ." Doc. No. 92 at 19.)  However, the evidence is that six SWAT team members entered the residence on September 2, 2009.  Agent Stoll testified that only four to five BCSO agents participated in the search.  The Defendants also allege that the SWAT team members were wearing "battle regalia" including masks and camouflaged uniforms.  (Doc. No. 92 at 5, 22.)  However, Lieutenant Barnett testified that the SWAT team members were not wearing masks and were instead wearing Class B uniforms with the "Sheriffs' Office" logo in yellow on the front, back, and sleeves of the uniform and entry gear.  Agent Ziccardi testified that he was wearing shorts and a tee shirt with a mask covering his face, and that the agents of the Special Investigation Units routinely wore such masks in an effort to protect their identity.  However, Agent Stoll testified that he was not wearing a mask due to his illness.

a residence pursuant to a lawfully issued warrant when there is no response to a knock on the door);

*United States v. Hromada*, 49 F.3d 685, 691 (11th Cir. 1995) (finding that officers did not violate the

knock and announce provision by allegedly waiting less than one minute after they announced their

presence before they broke down the door).

The SWAT team members were initially only able to open the door a few inches because there

were a sofa and one or more steel tanks blocking the door.[23]   However, when the SWAT team

members were able to enter the residence, Barnett testified that they were immediately confronted by

Mr. Neth who was noncompliant, angry, and argumentative about securing the dogs,[24] and appeared

to be aggressive.[25]  He did not know if Mr. Neth or the other occupants of the house had weapons.  Mr.

Neth was eventually secured on the ground with a flex tie and helped onto the couch within minutes

of the SWAT team entering the residence.[26]  The Court finds that it was reasonable for the SWAT

---

[23]   The sofa can be seen in Government's Exhibit 11, and the steel tanks are visible in Government's Exhibit 20.  Mr. Neth testified that the sofa had been moved against the front door in order to prevent the dogs from getting out of the house.

[24]  Mr. Neth testified that there were three boxers and a rottweiler present inside the residence at the time the SWAT team members arrived.  Both Mr. Neth and Ms. Aldridge testified that Mr. Neth repeatedly asked the SWAT team members to allow him to secure the dogs.  Barnett testified that the dogs were aggressive.  A picture of one of the boxers can be seen in Defendants' Exhibit 2.

[25]  Mr. Neth testified that immediately after the SWAT team members breached the front door, he looked down and saw that he was "lit up like a Christmas tree" with at least a dozen red dots. However, on cross examination, Mr. Neth admitted that he did not see a dozen guns inserted through the front door when the SWAT team members were attempting to enter the residence.  In fact, according to Barnett's testimony, there were only six SWAT team members who entered through the front door, and none of them carried weapons equipped with lasers that would have been visible to the naked eye.

[26]  In the Motion to Suppress, Defendants maintain that Mr. Neth was "pinned to the floor by several SWAT team members who violently twisted and contorted his leg almost dislocating his hip as he screamed in pain." (Doc. No. 92 at 5-6.)  Mr. Neth testified that he was tackled by a member(s) of the SWAT team and landed on his brown dog.  He did not state the number of people who tackled

team to have secured Mr. Neth in this manner amidst the commotion created by the three boxers and the rottweiler, as well as Mr. Neth's admitted noncompliance with the direction of the SWAT team.

Ms. Aldridge testified that after the SWAT team permitted her to put her dog, the rottweiler, in the back sunroom, she was pushed to the ground from behind, a shoe was placed against her face, and she was tethered immediately after she decided to move her hands in a "praying position."[27] There is no evidence that Ms. Aldridge was injured by this action.[28] The Court finds that the SWAT team's

---

him. He stated that he yelled that he could not move his leg, and another officer came over, observed aloud that Mr. Neth could not bend the way he was being forced to bend, and "helped me out." On cross-examination, Mr. Neth admitted that he did not, at any time prior to filing the Motion to Suppress, complain to the BCSO regarding injuries to his hip. He further admitted that the alleged injury did not require him to increase the amount of pain medication he was already taking, and that he did not seek medical attention for the alleged injury. A photograph of Mr. Neth taken during the search is contained in Government's Exhibit 8. It is undisputed that Mr. Neth did not cooperate with the SWAT team's directions on its entry into the Banana Residence and that he had dogs loose in the house which were barking and posed a potential threat to the officers. Any injury Mr. Neth suffered from being tackled and subdued was momentary and reasonable under the circumstances. There was no evidence to support the contention of the Defendants that any officer involved in the entry and search of the Banana Residence intentionally bent Mr. Neth's prosthesis. In fact there was no evidence that any officer knew that Mr. Neth had a prosthetic leg while he was being recalcitrant and before he was subdued. Agent Ziccardi testified that no one complained of injury or pain or asked for medical attention while the search was being conducted.

[27] Ms. Aldridge testified that after she had crawled back from securing her rottweiler and while still kneeling on the floor, she assumed a "praying" position which she demonstrated from the witness stand. In this position she bent over towards the floor then straightened out from her body and spread apart her hands and arms. There was no evidence that she did this on direction of the officers or with any warning to them.

[28] In the Motion to Suppress, Defendants allege that they were "physically hurt," and that the officers "molested all of the occupants." (Doc. No. 92 at 19, 22.) At the evidentiary hearing, however, Ms. Aldridge testified that she was not injured during the execution of the search warrant, and, as discussed previously, Agent Ziccardi testified that no one complained of injury or pain while the search was being conducted or asked for medical attention.

actions were reasonable as Aldridge chose, on her own volition, to move her hands in a manner that could have been interpreted by a reasonable officer as an attempt to reach for a weapon.[29]

Overall, taking into consideration the totality of the circumstances, including the occupants' failure to respond to the knock and announce, the blockage of the front door, Mr. Neth and Ms. Aldridge's admitted noncompliance with the directions of the SWAT team, the recalcitrance of Mr. Neth, the presence of four large, barking dogs some of which were not secured, and the fact that the SWAT team was executing a search warrant for a suspected cannabis grow operation, the Court does not find that the SWAT team executed the Banana search warrant in a manner inconsistent with the Fourth Amendment.[30]

---

[29] In the Motion to Suppress, Defendants claim that they were denied access to toilet facilities, that Mr. Neth was ridiculed for having to used the bathroom, and that the Defendants were denied access to food and water during the execution of the search. (Doc. No. 92 at 6, 22.) However, both Mr. Neth and Ms. Aldridge testified that they were in fact able to use the facilities during the execution of the search, and there is no evidence that Mr. Neth was ridiculed for using the bathroom. Furthermore, there is no evidence that either Mr. Neth or Ms. Aldridge requested food or water during the execution of the search. Defendants additionally allege that the search was unreasonable because numerous guns were pointed in their face. (*Id*. at 22.) This is consistent with Lieutenant Barnett's testimony that while one SWAT team member applied the flex tie to Ms. Aldridge and Mr. Neth, another SWAT team member held a gun to them. Barnett testified that this practice is consistent with the normal procedure of securing occupants.

[30] There is no evidence that the Defendants were tortured, harmed, belittled, or subjected to unnecessary force as argued in their Motion to Suppress. (Doc. No. 92 at 6, 22.) The wearing of masks by the agents and the yelling of orders accompanied by obscenities by SWAT team members is a method of securing control of a dangerous situation, preventing harm to occupants and officers, and preserving the identity of agents who often are involved in numerous narcotics investigations and do not want to compromise their identities. Apparently during the execution of the search warrant at the Banana Residence there were times in which both the officers and Mr. Neth engaged in the use of obscenities.

**D. State of Banana Residence**

"The general touchstone of reasonableness which governs Fourth Amendment analysis governs the method of execution of the warrant." *United States v. Ramirez*, 523 U.S. 65, 71 (1998) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 108-09 (1997)). Thus, the "excessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *Id*. Here, the Defendants allege that the Banana residence was in a "state of complete disarray" following the execution of the search warrant. The Defendants provided pictures of the residence demonstrating that the front door frame had been damaged by the battering ram, that items had been removed from the cabinets and drawers and left about the residence, that cushions had been upended, and that rubber gloves, trash bags, and turned over garbage cans had been left in the yard. From the evidence, the actual destruction of property was minimal and justified by the officers' need to enter the residence.[31] *See, e.g., Dalia v. United States*, 441 U.S. 238, 258 (finding that "officers executing search warrants on occasion must damage property in order to perform their duty."). The proper execution of a warrant demands a thorough search of the premises. Even if conducted with due care for preserving the homeowner's possessions, any complete examination necessarily results in some risk of damage and disorder. *See, e.g.*, *United States v. Davis*, 617 F.2d 677, 695 (D.C. Cir. 1979) (finding that the use of a battering ram, the opening of drawers, and damage to personal property did not constitute an unreasonable search); *Williams v. Alford*, 647 F. Supp. 1386, 1392 (M.D. Ala. 1986) (determining that the Fourth Amendment had not been violated where the search resulted in minimal destruction of

---

[31] Aside from the damage to the door frame, the Defendants do not allege that any property was damaged or destroyed.

property but left the house in "substantial disarray"). Accordingly, the Court finds that the type of damage and disarray demonstrated by the Defendants does not state a violation of constitutional magnitude. [32] Taking into consideration the totality of the circumstances surrounding the execution of the search warrant, including the compliance with the knock and announce requirement, the failure to provide a copy of the search warrant to Mr. Neth for any significant length of time, the actions of the SWAT team members, and the damage to the property, the Court finds that the execution of the search warrant, in its entirety, was reasonable under the Fourth Amendment.

## III. Execution of the Parkland Search Warrant

Defendant Hansen argues that the execution of the Parkland search warrant violated the Fourth Amendment because the BCSO failed to leave a copy of the search warrant at the residence. The Parkland residence was unoccupied when the SWAT team executed the search warrant, and thus the SWAT team was unable to personally deliver the warrant to an occupant at the time of entry. Agent Hart testified that on such occasions, it was the standard procedure of the BCSO to leave a copy of the warrant and the inventory in a conspicuous location within the residence. Agent Hart further testified that he followed these standard procedures in executing the Parkland residence search warrant by leaving a copy of the warrant and the inventory on either a table or counter in the kitchen. Agent Hart testified that the search warrant return affidavit indicated his compliance with these procedures. Ms. Hansen failed to provide any credible evidence establishing that the BCSO did not leave a copy of the

---

[32] The Banana residents were living in a small area in the midst of an indoor cannabis grow house that occupied all of the bedrooms. The majority of the residence had undergone an elaborate conversion to a full scale grow house of over 200 plants, leaving only a small living space in the front of the residence for Mr. Neth and Ms. Aldridge. Agent Ziccardi testified that the house was in disarray when the SWAT team entered.

search warrant and inventory at the Parkland residence. Accordingly, the Court finds Agent Hart's testimony to be credible and therefore finds that Agent Hart left a copy of the search warrant at the Parkland residence.[33]

### Conclusion

Based on the foregoing, the Motion to Suppress by Gary Charles Neth and Nicole Ann Aldridge (Doc. No. 92, filed Feb. 16, 2010) is **DENIED.**

**DONE** and **ORDERED** in Orlando, Florida on this ___30th____ day of March, 2010.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

United States Marshal
United States Attorney
United States Probation Office
United States Pretrial Services Office
Counsel for Defendant
GARY CHARLES NETH
NICOLE ANN ALDRIDGE
JANINE SCHELLER HASKELL
RICHARD BENJAMIN OWEN JR,
Clara Ellen Hansen

---

[33] To the extent Defendants argue that the time line of events in this case presented by the Government is unworthy of belief, the Court finds no evidence to support such an assertion.

-29-